1
2
3
4
5
6

**FARUQI & FARUQI, LLP**
Barbara A. Rohr  SBN 273353
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
Email: brorh@faruqilaw.com
**[Additional counsel on signature page]**

*Attorneys for Plaintiff*

7
8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 9  SHIKHA GUPTA, On Behalf of Himself and All Others Similarly Situated,  ) | Case Number   **'16CV2084 JAH KSC** |
| 10  Plaintiff,  ) | |
| 11  v.  ) | **CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(d)(4), 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| 12  SEQUENOM, INC., KENNETH F. BUECHLER, PH.D., MYLA LAI-GOLDMAN, M.D., RICHARD A. LERNER, M.D., RONALD M. LINDSAY PH.D., DAVID PENDARVIS, CATHERINE J. MACKEY, PH.D., CHARLES P. SLACIK, and DIRK VAN DEN BOOM, PH.D.,  ) | |
| 17  Defendants.  ) | **JURY TRIAL DEMANDED** |

18
19
20
21
22
23
24
25
26
27

Shikha Gupta ("Plaintiff"), on behalf of himself and all others similarly situated, by his undersigned attorneys, alleges the following upon information and belief, except as to those allegations specifically pertaining to Plaintiff and his counsel, which are made on personal knowledge, based on the investigation conducted by Plaintiff's counsel.  That investigation included reviewing and analyzing information concerning the proposed acquisition of Sequenom, Inc. ("Sequenom" or the "Company") by Laboratory Corporation of America Holdings ("LabCorp") through a tender offer ("Proposed Transaction"), which Plaintiff (through his counsel) obtained from, among other sources: (i) publicly available

28

press releases, news articles, and other media reports; (ii) publicly available financial information concerning Sequenom; and (iii) filings with the U.S. Securities and Exchange Commission ("SEC") made in connection with the Proposed Transaction.

## SUMMARY OF THE CASE

1.    This is a stockholder class action commenced on behalf of the holders of the common stock of Sequenom, against Sequenom and the members of Sequenom's board of directors (the "Individual Defendants" or "Board" and together with Sequenom, the "Defendants"), for their violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.SC. §§ 78n(d)(4),78n(e), 78t(a), and SEC Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9").

2.    Defendants have violated the above-referenced sections of the Exchange Act by causing a materially incomplete and misleading *Schedule 14D-9 Solicitation/Recommendation Statement* ("14d9") to be filed with the SEC.  The 14d9 recommends that Sequenom stockholders tender their shares pursuant to the terms of a tender offer (the "Tender Offer"), whereby LabCorp seeks to acquire all the outstanding shares of common stock of Sequenom for $2.40 per share (the "Offer Price").

3.    On July 26, 2016 Sequenom, LabCorp and its wholly-owned subsidiary, Savoy Acquisition Corp. ("Merger Sub") entered into a definitive *Agreement and Plan of Merger* (the "Merger Agreement").  Pursuant to the Merger Agreement, LabCorp, through Merger Sub, commenced the Tender Offer on August 9, 2016.  The Tender Offer is scheduled to expire at 12:01 midnight Eastern Time on September 7, 2016.  Following the completion of the Tender Offer, and subject to the terms and conditions of the Merger Agreement, Merger

1  Sub will be merged with and into Sequenom, with Sequenom surviving as a wholly
2  owned subsidiary of LabCorp (the "Merger").

3      4.      The Offer Price undervalues Sequenom stock and the 14d9 is false
4  and/or misleading in its description of the process and financial analyses leading
5  up to the Board's vote to accept the inadequate Offer Price.

6      5.      Until May 2015, Sequenom's stock had traded at nearly double the
7  Offer Price. Since then the Company has had to address typical operational and
8  financial issues faced by biotechnology companies investing heavily in research
9  and development and looking for profitable products.  Indeed, while 2015 was
10 tough year for the Company, it had initiated cost-cutting steps, sought to
11 capitalize on newly-developing market opportunities arising from its technology,
12 including "liquid biopsy" procedures to detect cancer, and launched a new
13 product.

14     6.      Indeed, as revealed in the 14d9 (discussed below), the Individual
15 Defendant, Dirk van den Boom, Ph.D., president and chief executive officer
16 ("CEO") of Sequenom, viewed the Company's stock as artificially depressed due
17 to the outstanding convertible debt Sequenom had relied on to capitalize the
18 Company and the impeding maturity of that debt and the need to refinance.[1]

19     7.      The Company's turnaround is evidenced in the release of its results
20 for the second quarter 2016, in which the Company reported among other things
21 revenues for the June 2016 quarter of $29.3 million, beating expectations of $28.6
22 million.

23     8.      Rather than wait for the second quarter earnings, the Board closed the
24 deal with LabCorp before the results of the Company's efforts were fully realized
25

26 [1]  The Company needed to refinance $130 million aggregate principal amount of convertible
   debt, $45 million of which is due in 2017 and $85 million of which is due in 2018.
27

28

1  and despite having negotiated the refinancing the convertible notes, as reflected in

2  a term sheet.

3       9.     Thus, based on the Company's prior performance and the investment

4  the Defendants made into the Company's future performance, the turn around in

5  the Company's operations reflected in the earnings release for the 2Q 2016 and

6  having obtaining financing for the outstanding debt, the paltry $2.40 per share

7  Offer Price is inadequate, does not reflect the Company's prospects for future

8  growth, and represents a complete abdication by the Board of Directors of its

9  responsibilities and duties owed to Sequenom investors.

10      10.    LabCorp recognizes the great value to it of the Proposed Transaction

11 and implicitly that it is acquiring Sequnom while the stock is temporarily

12 depressed. LabCorp's CEO and chairman of the LabCorp board of directors, David

13 P. King, stated in the press release announcing the Proposed Transaction:

14         Sequenom's market-leading NIPT [non-intrusive prenatal testing] and
15         genetic testing capabilities will advance LabCorp's strategy to deliver
           world-class diagnostic solutions … This is exactly the kind of
16         strategic acquisition that LabCorp seeks: Sequenom was the first
           laboratory to offer a clinically validated NIPT test (MaterniT$^{®}$21) and
17         has performed more than 500,000 tests to date. Sequenom's proven
           best-in-class technology and strong research complement LabCorp's
18         extensive women's health offering, providing patients and physicians
           with one source for the most complete range of testing options in
19         women's health, including NIPT and reproductive genetics….

20         Sequenom expands LabCorp's geographic reach both domestically
           and internationally, offering services through licensing and
21         commercial partnerships with an emphasis on the European Union
           and Asia Pacific. The addition of Sequenom to the LabCorp family
22         meets our stated financial criteria, and creates a market leader in
           NIPT, women's health and reproductive genetics, furthering our
23         mission to improve health and improve lives around the globe.

24      11.    Analysts too view the Offer Price as too low, with one commentator

25 writing that "anyone who reviews the Sequenom balance sheet can see that this

26

27                                      - 4 -
28                                   COMPLAINT

was a distressed sale."[2]

12.    Despite the potential for increased future value creation, Defendants agreed to the inadequate Offer Price and made little to no effort to truly market the Company, on information and belief due to the significant economic benefits the Company's directors (the Individual Defendants as defined below) will reap through a transaction with LabCorp.

13.    The personal benefits that the Individual Defendants will receive from a transaction with LabCorp, and that the other public stockholders (and class members) will not, include the acceleration and vesting of restricted stock units, consideration that will not be shared by the Class.   The Proposed Transaction provides the added benefit of liquidity to certain Individual Defendants, who are non-employee Directors of the Board, as their illiquid holdings shed their restrictions as a result of the Merger Agreement.   Therefore, the Individual Defendants were incentivized to drive a sales process that primarily served their own interests and was grossly unfair to Sequenom stockholders.

14.    To further lock up the transaction with LabCorp, the Defendants also agreed to unreasonable deal-protection devices that unfairly favor LabCorp and discourage potential bidders from submitting a superior offer for the Company. These preclusive devices include: (i) a non-solicitation provision that restricts the Board from soliciting other potentially superior offers for the Company; (ii) an "information rights" provision, which provides LabCorp with unfettered access to information about other potential proposals, gives LabCorp five business days to match any competing offer, and provides LabCorp with the perpetual right to attempt to match any superior bid; and (iii) a termination fee of $10.6 million,

---

[2]   http://seekingalpha.com/article/3996954-sequenom-last-chapter-head-scratcher  (last   visited 8/17/2016)

1    which deters other potential suitors from making a superior proposal.

2          15.    In pursuing the plan to facilitate the LabCorp acquisition of Sequenom

3    for grossly inadequate consideration, through a flawed process, the Defendants

4    have now asked Sequenom's stockholders to tender their shares for inadequate

5    consideration based upon the materially incomplete and misleading representations

6    and information contained in the 14d9, in violation of Sections 14(d)(4), 14(e), and

7    20(a) of the Exchange Act.  Specifically, the 14d9 contains materially incomplete

8    and misleading information concerning: (i) the background of the Proposed

9    Transaction; (ii) the Company's internal financial data forecasts; and (iii) the

10   financial analyses of the Proposed Transaction performed by Sequenom's financial

11   advisor, J.P. Morgan Securities LLC ("JP Morgan').

12         16.    For these reasons and as set forth in detail herein, Plaintiff seeks to

13   enjoin Defendants from taking any steps to consummate the Proposed Transaction

14   or, in the event the Proposed Transaction is consummated, to recover damages

15   resulting from the Individual Defendants' violations of the Exchange Act.

16                       **<u>JURISDICTION AND VENUE</u>**

17         17.    The claims asserted herein arise under Sections 14(d), 14(e), and 20(a)

18   of the Exchange Act, 15 U.S.C. §78n.  The Court has subject matter jurisdiction

19   pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C.

20   §1331.

21         18.    This Court has personal jurisdiction over all of the Defendants

22   because each is either a corporation that conducts business in and maintains

23   operations in this District or is an individual who either is present in this District

24   for jurisdictional purposes or has sufficient minimum contacts with this District so

25   as to render the exercise of jurisdiction by this Court permissible under traditional

26   notions of fair play and substantial justice.

27

28

19.    Venue is proper under Section 27 of the Exchange Act, 15 U.S.C. §78aa, as well as pursuant to 28 U.S.C. §1391 because Sequenom maintains its principle executive offices in this District, each Defendant transacted business in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

20.    Plaintiff currently holds shares of common stock of Sequenom and has held such shares at all relevant times.

21.    Defendant Sequenom is a Delaware corporation headquartered at 3595 John Hopkins Court, San Diego, California. Sequenom is a life sciences company that develops and commercializes molecular diagnostics testing services for the women's health and oncology   The Company's common stock trades on the Nasdaq stock exchange under the symbol "SQNM".

22.    Individual Defendant Kenneth F. Buechler, Ph.D., has served as a director since December 2009 and is the current chairman of the board.

23.    Individual Defendant Myla Lai-Goldman, M.D., has served as a director since September 2012.

24.    Individual Defendant Richard A. Lerner, M.D., has served as a director since June 2007.

25.    Individual Defendant Ronald M. Lindsay, Ph.D., has served as a director since May 2003.  Lindsay previously served as Executive Vice President, Strategic Planning, and as Executive Vice President of Research and Development.

26.    Individual Defendant David Pendarvis, has served as a director since December 2009.

27.    Individual Defendant Catherine J. Mackey, Ph.D., has served as a director since June 2015.

28.   Individual Defendant Charles P. Slacik, has served as a director since June 2011

29.   Individual Defendant Dirk van den Boom, Ph.D. has served as a director since April 1, 2015 and as our President and Chief Executive Officer since December 10, 2015.  Previously he served as our Interim President and Chief Executive Officer since September 19, 2015, our Executive Vice President and Chief Scientific and Strategy Officer since March 2015, our Chief Scientific and Strategy Officer from June 2014 through March 2015 and as our Executive Vice President, Research and Development and Chief Technology Officer from December 2012 through June 2014. Prior to that, he had served as our Senior Vice President of Research and Development since August 2010 and as our Vice President, Research and Development from October 2009 through August 2010.

30.   The above members of the Sequenom board of directors may also collectively be referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.   Background

31.   Sequenom (with its wholly owned subsidiary Sequenom Center for Molecular Medicine LLC, doing business as Sequenom Laboratories) describes itself in its SEC filings as "a pioneering genetic testing company dedicated to women's health through the development of innovative products and services.  The Company serves patients and physicians by providing early patient management information.  The Company develops and commercializes innovative molecular diagnostics testing services that serve the women's health market and is developing products and services for the oncology market."[3]

---

[3] *See e.g.*, www.sec.gov/Archives/edgar/data/1076481/000107648116000077 /a2016q110qearningsrelease.htm (last visited 8/17/2016)

32.     Sequenom has sought to address increased competition in the field of non-invasive prenatal testing and other financial issues, which significantly impacted operations in 2015.  Dr. van den Boom commented on the state of the Company and prospects for its future in a press release announcing the fourth quarter 2015 results:

> We believe the clearest view of Sequenom's current business trend can be seen by comparing our fourth quarter units to those in our third quarter of 2015 …When viewed from this perspective, our commercial efforts are beginning to pay off in the form of higher test volumes, which we expect to continue into 2016….
>
> We made several key transitions in 2015, with our business model now including a recurring revenue stream. 2015 was the first full year under the patent pool agreement, which allows Sequenom to benefit financially when others use the intellectual property we developed for NIPT. During 2015, we launched three new tests including the most comprehensive NIPT available on the market today, MaterniT® GENOME.  With MaterniT GENOME's unmatched performance, Sequenom now offers the greatest number of options to physicians seeking to provide the best in patient care. Other key 2015 accomplishments included an agreement with United Healthcare to bring Sequenom's tests in-network, and the completion of key oncology development milestones including analytical validation and the signing of more than five academic collaboration agreements … We believe that these accomplishments, together with our early 2016 decisions to achieve operating cost reductions and explore partnerships for our oncology programs, will allow Sequenom to establish its tests in new markets and position the company to achieve a neutral operating cash flow run rate by the end of 2017, in line with prior guidance.[4]

33.     As evidenced in this press release, the Company had implemented a plan to launch new tests and develop new marketing opportunities through oncology programs.  Indeed, its new test, MaterniT® GENOME, a noninvasive prenatal test that evaluates genome-wide chromosomal copy number status, has received significant press and contributed to a turnaround of the Company.

---

[4]www.sec.gov/Archives/edgar/data/1076481/000107648116000068/ex991sqnm10-k2015earningsr.htm (last visited 8/17/2016)

Sequenom launched MaterniT Genome in the third quarter of 2015 and has marketed it claiming that it can detect an extra copy of chromosome 21, the cause of Down syndrome and detect missing, duplicated, or misplaced DNA larger than seven million genetic letters—about 1/20th the size of a chromosome.  The Company touts the product as the most comprehensive non-invasive prenatal screen test in the market.  The test can analyze a baby's chromosomes to identify extra or missing parts of chromosomes or other chromosomes changes, what can potentially negatively impact the baby's health.

34.   The Company updated the market on MaterniT® GENOME on January 11, 2016.  Dr. van den Boom announced preliminary 2015 results:

> Demand for our new MaterniT® GENOME product, launched just at the end of August, has been stronger than we originally expected, both domestically and internationally … While we are encouraged by the positive reception of MaterniT® GENOME by physicians and patients, we are carefully positioning the test with clinicians to ensure that it is used where it can provide the highest value. Over 3,000 MaterniT® GENOME tests were accessioned in the fourth quarter of 2015, representing the product's first full quarter of sales.[5]

35.   In April 2016, the Company announced plans to "sharpen the company's focus on its core women's health business, reduce its operating costs and optimize its organizational structure and processes.   Among these initiatives are plans to divest Sequenom's North Carolina operations, partner non-core assets,

---

[5]   www.sec.gov/Archives/edgar/data/1076481/000119312516425659/d120851dex991.htm.(last visited 8/17/2016). Each test performed relates to a patient specimen collected by a health care professional, and received by the laboratory. Such specimen encounter is commonly referred to as an "accession" in the laboratory sector. Although accessions are not billed until the test is complete and results are reported to the ordering physician, we believe that the number of accessions received is useful to understand the volume of Sequenom Laboratories' business. These tests are typically completed within approximately five business days from the date of accession.

COMPLAINT

improve laboratory efficiency and increase organizational effectiveness."[6]

36.    Dr. van den Boom state:

> We believe these changes will position Sequenom to achieve higher levels of near-term performance while still allowing us to pursue our longer-term potential …We have the most comprehensive portfolio of products for noninvasive prenatal applications, a game changing new product in our MaterniT[®] GENOME laboratory-developed test, an experienced sales force, and an increased focus on serving physicians addressing average risk pregnancies. Because these advantages are considerable, it is essential for us to concentrate our resources on making the most of our opportunities in women's health…

> The company will focus its R&D programs on broadening the portfolio with tests serving obstetricians, gynecologists and maternal fetal medicine specialists, and expand its presence in the obstetrics and gynecology sales channel to better serve average risk and high risk pregnancies seen by these physicians… In making these changes, we are committed to unlocking the value that already exists in the business.

37.    All of these efforts resulted in the Company turning around operational results. The positive impact on the Company's operations was evident in Sequenom's second quarter earnings results.  The company reported ($0.05) EPS for the quarter, beating analysts' estimate, e.g., the Zacks' consensus estimate of ($0.09) by $0.04.

38.    The Company also has been involved in extensive litigation over its exclusive license to US patent 6,258,540 (the "540 Patent") which was directed to a method of using cell-free fetal DNA ("cffDNA") circulating in maternal plasma (cell-free blood) to diagnose fetal abnormalities.  The method was based on the newly discovered natural phenomenon that cffDNA circulating in maternal plasma includes the presence of paternally inherited cffDNA.  The method included the

---

6    http://sequenom.investorroom.com/2016-01-07-Sequenom-Inc-Announces-Restructuring-Plans-Sale-Of-North-Carolina-Operations-And-Initiatives-To-Improve-Efficiencies. (last visited 8/17/2016).

steps of amplifying and then detecting paternally inherited DNA from the plasma sample.  Sequenom launched a test based on this method.  Many other companies including Ariosa Diagnostics, Inc began to market similar tests and cut prices.  A law suit ensued in which infringement was alleged and the validity of US patent 6,258,540 was called into question.  The Federal Circuit concluded that (1) the claims of US patent 6,258,540 were "directed to a patent-ineligible concept" because the "method begins and ends with a natural phenomenon" (i.e., cffDNA) and (2) the claimed method did not "'transform' the claimed naturally occurring phenomenon into a patent-eligible application" of the phenomenon.  The U.S. Supreme Court denied cert in 2016.  The Company stated that it "believes that the ruling has little business impact as it has been operating under the District Court's invalidity ruling since October, 2013 and due to the pooling arrangement of NIPT intellectual property entered into with Illumina, Inc. in December, 2014.   In addition, valid and enforceable patents with claims equivalent to those of the '540 Patent are issued in Europe, Japan, Hong Kong, Canada and Australia."[7]

39.    In sum, Sequenom has committed itself to transitioning to address changing market forces and that is expected to result in growth and opportunities and increased stockholder value in the coming years.  Despite the Company's strong operational prospects, the Board agreed to sell the Company at a price below its intrinsic value, to the detriment of Sequenom's common stockholders.

**B.    The Proposed Transaction**

40.    On July 27, 2016, Sequenom and LabCorp issued a joint press release announcing the Proposed Transaction:

---

[7]    http://sequenom.investorroom.com/2016-06-27-The-Supreme-Court-Of-The-United-States-Denies-Sequenoms-Petition-Requesting-Review-Of-Decision-On-540-Patent.    (last    visited 8/17/2016).

**ABCORP ANNOUNCES AGREEMENT TO ACQUIRE SEQUENOM**

***Acquisition Creates Market Leader in NIPT, Women's Health and Reproductive Genetics***

***LabCorp CEO: 'This is exactly the kind of strategic acquisition that LabCorp seeks'***

BURLINGTON, N.C., and SAN DIEGO — (BUSINESS WIRE) — July 27, 2016 — Laboratory Corporation of America® Holdings (LabCorp®) (NYSE:LH), the world's leading healthcare diagnostics company, and Sequenom, Inc. (NASDAQ: SQNM), a pioneer in non-invasive prenatal testing (NIPT) for reproductive health, today announced that they have entered into a definitive agreement and plan of merger under which LabCorp would acquire all of the outstanding shares of Sequenom in a cash tender offer for $2.40 per share, or an equity value of $302 million, which represents a total enterprise value of approximately $371 million, including net indebtedness.

"Sequenom's market-leading NIPT and genetic testing capabilities will advance LabCorp's strategy to deliver world-class diagnostic solutions," said David P. King, chairman and chief executive officer of LabCorp. "This is exactly the kind of strategic acquisition that LabCorp seeks: Sequenom was the first laboratory to offer a clinically validated NIPT test (MaterniT®21) and has performed more than 500,000 tests to date. Sequenom's proven best-in-class technology and strong research complement LabCorp's extensive women's health offering, providing patients and physicians with one source for the most complete range of testing options in women's health, including NIPT and reproductive genetics."

King added: "Sequenom expands LabCorp's geographic reach both domestically and internationally, offering services through licensing and commercial partnerships with an emphasis on the European Union and Asia Pacific. The addition of Sequenom to the LabCorp family meets our stated financial criteria, and creates a market leader in NIPT, women's health and reproductive genetics, furthering our mission to improve health and improve lives around the globe.

"We are extremely excited to join LabCorp in its mission to deliver world-class diagnostic solutions," said Dirk van den Boom, Ph.D., president and CEO, Sequenom. "Strategically, this transaction makes sense. LabCorp is the world's leading healthcare diagnostics company, providing comprehensive clinical laboratory and end-to-end drug development services. Sequenom is a pioneer in noninvasive prenatal testing for reproductive health. Over the last nine months, Sequenom has vastly enhanced its technology, operations, and business prospects. The opportunities this transaction presents are significant and important both for our reproductive health business as

- 13 -

well as our liquid biopsy strategy. Becoming part of LabCorp helps Sequenom reach a much broader market for our innovative testing."

Under the terms of the agreement and plan of merger, LabCorp has formed an acquisition subsidiary, Savoy Acquisition Corp., that will commence a tender offer to purchase all outstanding shares of Sequenom for $2.40 per share. Following the completion of the tender offer, LabCorp expects to consummate a merger of Savoy Acquisition Corp. and Sequenom in which shares of Sequenom that have not been purchased in the tender offer will be converted into the right to receive the same cash price per share as paid in the tender offer. The tender offer and the merger are subject to customary closing conditions set forth in the merger agreement, including the acquisition by Savoy Acquisition Corp. of a majority of Sequenom's outstanding shares at the time of the consummation of the tender offer and the expiration or early termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended. The closing of the acquisition is expected by year end.[8]

41.   LabCorp provides clinical laboratory services, performing tests for urinalyses, HIV tests, and Pap smear, and specialty testing for diagnostic genetics, disease monitoring, forensics, identity, clinical drug trials, and allergies.  LabCorp provides end-to-end drug development support.  LabCorp operates more than 1,700 service sites that collect specimens and some 40 primary labs where tests are performed.

42.   The per share consideration being offered to Sequenom's public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of the Company's common stock is materially in excess of the amount offered given the Company's prospects for future growth and earnings.

43.   The process that led to this announced Proposed Transaction was flawed from the beginning and the description of the process contained in the 14d9

---

[8] www.sec.gov/Archives/edgar/data/920148/000119312516660290/d200168dex99a5a.htm. (last visited 8/17/2016).

COMPLAINT

1    is false and/or misleading.

2         44.   As described in the 14d9, on July 12, 2015, Bill Welch, then the CEO

3    Sequenom, asked JP Morgan to make a presentation to the Board about

4    Sequenom's financial and market situation and potential strategic and financing

5    alternatives.  JP Morgan presented this information at the July 28, 2015 Board

6    meeting, and discussed opportunities for strategic acquisitions by Sequenom in the

7    oncology market and opportunities for strategic partnering with third parties.  The

8    Board authorized JP Morgan to evaluate the opportunities that were discussed and

9    to develop a plan for potential investment and/or collaboration opportunities with

10   strategic partners.  Disclose the opportunities that were discussed at the July 29,

11   2015 Board meeting.  (14d9, 13).

12        45.   This process was initiated around the time that the Company

13   announced the launch of MaterniT Genome, the first noninvasive prenatal test

14   ("NIPT") to provide karyotype-level insight into fetal chromosomal status prior to

15   considering an invasive procedure.  According to the Company, "The MaterniT™

16   GENOME test adds genome-wide identification of chromosomal gains or losses

17   greater than 7 megabases (Mb) in size to Sequenom Laboratories' growing NIPT

18   testing portfolio."[9]  This new product as well as the Company's efforts in the

19   "liquid biopsy" field for cancer testing, were areas in which the future CEO, Dr.

20   van den Boom, later stated "Within reproductive health, I am particularly

21   enthusiastic about our MaterniT™ GENOME laboratory-developed test.  This

22   launch represents an exciting new test that should allow for future growth in the

23   NIPT market.  Moreover, we continue to make progress in oncology.[10]

24   _____

25   [9]   http://sequenom.investorroom.com/2015-07-13-Sequenom-Laboratories-Launches-MaterniT-
     GENOME (last visited 8/17/2016)

26   [10]   http://sequenom.investorroom.com/2015-09-25-Sequenom-Inc-Updates-Second-Half-2015-
     Revenue-Outlook (last visited 8/17/2016)

27

28

1   Nevertheless, the Board proceeded with a process principally to sell the Company.

2   46.   At an August 18, 2015 board meeting, the Board discussed with JP
3   Morgan various structures for strategic alternatives, including potential investment
4   and/or collaboration activities with a strategic partner and divesting assets related
5   to Sequenom's women's health testing services business.  The Board discussed the
6   proposed scope of activities and authorized the engagement of JP Morgan.  One of
7   the bases for engaging JP Morgan was its familiarity with the Company's
8   outstanding convertible debt and Sequenom's financial position.  The Board
9   authorized JP Morgan to explore strategic alternatives, including potential
10  financing transactions for refinancing Sequenom's existing convertible debt,
11  potential investment and/or partnering activities with a strategic partner or the
12  potential sale of assets related to Sequenom's women's health testing services
13  business. (14d9, 13).

14  47.   Between August 23, 2015 and September 24, 2015, JP Morgan
15  reached out to approximately 25 parties about a potential strategic transaction,
16  including LabCorp, Company A, Company B, and Company C and circulated a
17  form confidentiality agreement.   No potential financial buyers were contacted
18  because it had been concluded that the profile of Sequenom was inconsistent with
19  targets pursued by financial buyers. (14d9, 13).

20  48.   From September 2015 to November 2015, Sequenom senior
21  management held a total of eleven meetings with interested parties, including
22  Company A, Company B, Company C, and LabCorp.  During this period, each of
23  Company A and Company B attended two meetings with Sequenom senior
24  management, and each of Company C and Parent attended one meeting. (14d9,
25  14).

26  49.   On September 2, 2015, Sequenom entered into a confidentiality

27

28

agreement with Company A, which included a standstill provision (without a "fall-away" provision (as defined below)) but permitted Company A to privately and confidentially approach Sequenom management during the standstill period.  On September 8, 2015, and September 20, 2015, Sequenom entered into a similar confidentiality agreement with Companies B and C respectively. (14d9, 14).

50.    On September 18, 2015, Bill Welch resigned as CEO and as a director of the Sequenom Board and Dirk van den Boom was elected as interim CEO.  Dr. van den Boom and the Sequenom Board subsequently continued to evaluate potential financing options for refinancing Sequenom's existing convertible debt, but really focused on a sale of the Company.  Thus, JP Morgan continued to examine potential strategic partnering or investment transactions, including spinning off the Company's oncology business and divesting assets related to Sequenom's women's health testing services business. (14d9, 14).

51.    On October 18, 2015, Company C submitted a nonbinding term sheet contemplating a $100 million equity investment in preferred stock and a $130 million investment to refinance Sequenom's convertible debt and a business collaboration.  The terms of the preferred stock and refinancing of debt were not specified and JP Morgan reached out to Company C to discuss the proposed terms. (14d9, 14).

52.    On October 23, 2015, Sequenom entered into a confidentiality agreement with LabCorp.  The confidentiality agreement included a standstill provision for the benefit of Sequenom that expires in April 2017, but terminates if (i) a third party unaffiliated with Parent commences or announces an intent to commence a tender offer or exchange offer for at least 50% of Sequenom's capital stock (provided that such standstill provision will automatically become applicable again if the third party announces its intent not to proceed with the proposed or

commenced tender offer or exchange offer), or (ii) a third party enters into an agreement with Sequenom to effect a transaction involving a sale of 50% or more of the capital stock or all or substantially all of the assets of Sequenom (a "fall-away" provision). The confidentiality agreement permits LabCorp to privately and confidentially approach Sequenom during the standstill period. (14d9, 14).

53.     JP Morgan updated the Board on the process at a board meeting on October 27 and 28, 2015, including contact with companies and/or entities not disclosed in the 14d9.  The Board reiterated that its $130 million in convertible debt that was maturing in 2017 and 2018 was depressing the Company's stock value and reiterated that a higher value could be obtained based on the Company's operations as a stand-alone business.  (14d9, 14).

54.     On October 29, 2015, LabCorp representatives met with Sequenom's management in San Diego to discuss Sequenom's business and prospects. (14d9, 14).

55.     On November 3, 2015, JP Morgan sent each of Company A, Company B, Company C, Parent and four other strategic parties a letter that provided guidelines for submitting a non-binding indication of interest ("IOI") for a potential strategic financing, partnering opportunity or acquisition of a specified business of Sequenom and asked that each party submit a proposal no later than December 2, 2015.  (14d9, 14).

56.     On December 2, 2015, LabCorp submitted an IOI to Sequenom to acquire the Company for between $1.90 and $2.06 per share of Common Stock. LabCorp also indicated that needed to validate certain assumptions and estimates supporting this offer prices through due diligence, that it would require an exclusivity period of 90 days if the Company signed a letter of intent, and also said that its offer was good to December 28, 2015.  (14d9, 14).

57.   On December 2, 2015, Company A and Company C also submitted first round proposals.  Company A proposed to purchase 19.9% of the Common Stock at a price per share to be determined at a later date.  Company C proposed two options: an outright acquisition for $2.51 per share of the Common Stock or a minority purchase of between $1.52-$1.61 per share of the Common Stock, up to $230 million, combined with a proposed business collaboration.  (14d9, 15).

58.   On December 4, 2015, Company B submitted a first round proposal of a $50 - $100 million equity investment or the purchase of Sequenom's clinical laboratory services operations and possibly other laboratory operations for an unspecified price and indicated it would consider other transaction alternatives proposed by Sequenom.  (14d9, 15).

59.   The Board reviewed these first round proposals at a board meeting on December 8 and 9, 2015 and instructed JP Morgan to focus only on parties interested in investing in the Company rather than a sale of the Company, in order to focus on remaining an independent company so that it could execute its operating plan.  Indeed, the Board was focused principally on addressing the financial situation arising from the maturing convertible notes and let the bidding parties know that it was seeking investment to address that situation.  (14d9, 15).

60.   On December 23, 2015, Company C submitted a revised proposal for a $50 million unsecured convertible bond financing that would result in an approximately 19.5% equity interest in Sequenom upon conversion.  (14d9, 15).

61.   On January 6, 2016, Company B indicated that it still was interested in an acquisition, but that its potential offer could be between $1.50 to $3.00 per share.  (14d9, 15).

62.   During this time, the Board also worked on and finalized a restructuring plan that involved among other things the sale of its North Carolina

COMPLAINT

operations approximately 20% reduction in workforce, a focus of its R&D programs on cost improvement opportunities, the expansion of its presence in obstetrics and gynecology sales channel to better serve average risk and high risk pregnancies and a decision to seek a strategic partner for the commercialization of its oncology liquid biopsy assays. (14d9, 15).

63.    Discussions with certain of the parties continued through the beginning of 2016 (Company A dropped out of the process as it was not willing to revise its proposal and B dropped out later in February also) and on February 2, 2016, the Board authorized a counter-proposal to Company C to enter into a business collaboration with Sequenom in which Company C would provide financing to Sequenom in the form of an $80 million convertible bond and $50 million term loan. The proposal also provided that Company C would receive warrants for up to 9.9% of the Common Stock, that Company C would have the right to nominate one member to the Board and that Company C and Sequenom would jointly identify, evaluate and pursue strategic collaborations. (14d9, 16).

64.    On February 15, 2016, Sequenom entered into an amendment to its engagement agreement with JP Morgan which, among other matters, gave JP Morgan the right to act as lead manager and sole bookrunner in case Sequenom were to issue any equity or debt securities through a public or Rule 144A offering or a private placement to a party that submitted a proposal as a result of JP Morgan's activities. (14d9, 16).

65.    On March 11, 2016, Company C  responded to Sequenom's counter proposal with new terms for the $80 million convertible bond and $50 million term loan. Sequenom discussed and also made a counter proposal to this offer, but Company C eventually withdrew from the process. (14d9, 16-17).

66.    In May 2016, the Company obtained a proposal for potential

COMPLAINT

refinancing of Sequenom's outstanding convertible debt.   The 14d9 fails to disclose any information about this debt source and the terms of the financing.   The Company continued to reach out to other sources of debt financing and on June 7, 2016, received a summary for terms for a proposed senior secured loan for up to $150 million.   The Company also received a proposal for an all stock transaction, but rejected it out of hand.  (14d9, 17).

67.   At a June 8, 2016, board meeting, the Board authorized JP Morgan to reach out again to LabCorp, Company B and Company C to inform them that Sequenom was pursuing a viable non-convertible debt financing transaction to replace the existing convertible debt and to assess their interest in a potential strategic transaction at a price per share of at least $3.00 per share.  (14d9, 17).

68.   On June 10, 2016, the Company provided access to LabCorp and Companies B and C to a data room to conduct due diligence.   The 14d9 indicates this was done based on their expression of interest, but fails to disclose the basis for creating the data room and what level of interest the Companies expressed in order to gain access to the Company's internal information.   LabCorp also conducted additional due diligence including meetings with the Company's management.  (14d9, 18).

69.   On June 15 and June 16, 2016, the Board reviewed the long-term outlook of Sequenom's reproductive health and oncology business segments and ongoing projects to improve costs. The 14d9 fails to disclose any information regarding the outlook of the Company's oncology business.  (14d9, 18).

70.   On June 20, 2016, Sequenom executed a term sheet with a debt source for debt financing of up to $150 million in the form of a senior secured loan, subject to completion of due diligence by the debt source and the negotiation and execution of definitive loan documents.   The terms of the financing included a high

interest rate and fees associated with the funding and would have been funded in three installments.  The conditions of the funding of the first installment of $90 million would have required that Sequenom successfully repurchase, at the discretion of the noteholders, at least 90% of the outstanding notes at a significant discount to par value.  The funding of the second and third installments totaling $60 million would have been subject to the achievement of designated revenue milestones by Sequenom.  (14d9, 18).

71.    On June 21, 2016, LabCorp submitted a revised IOI to acquire the Company for between $1.70 and $2.00 per Sequenom share.  The offer also provided for an exclusivity period until July 25, 2016.  The parties continued discussions about a strategic transaction.  (14d9, 18).

72.    On June 22, 2016, Company B submitted a verbal offer for $2.00 per Sequenom share.  Although JP Morgan informed Company B that the proposal was below the $3.00 minimum offer the Company sought, no additional efforts were made by Sequenom to engage Company B.  (14d9, 18).

73.    The Company reached out to Company C again, but Company C declined to submit a proposal based on a lack of "strategic fit.".  (14d9, 18).

74.    On June 24, 2016, Company D submitted an unsolicited stock for stock bid to acquire all of Sequenom in exchange for less than 20% of the outstanding stock of Company D, with an implied offer price of $1.24 per share.  (14d9, 18).

75.    On June 28, 2016, the Company terminated access to the data-room with the confidential financial data for bidders to conduct due diligence, even though access had only been granted approximately two weeks earlier.  The purported rationale was that no company had matched its minimum $3.00 per share requirement.    Nevertheless, LabCourt was provided exclusive access to

Sequenom's internal financial data to assess the value of the Company's net operating losses ("NOL") and their availability. (14d9, 18).

76.     On July 19, 2016, the Board decided to negotiate only with LabCorp for a sale of the Company and reached out to LabCorp. LabCorp submitted a bid of $2.30, Sequenom countered at $2.50 per Sequenom share, LabCorp countered at $2.37 per share, and by July 20, 2016, a deal was reached to sell the Company LabCorp at the $2.40 Offer Price. Thereafter, LabCorp conducted additional due diligence and the parties negotiated the terms of the Merger Agreement. (14d9, 19). No additional efforts were made to engage Company B, and on July 26, 2016, the Board voted to agree to the Proposed Transaction. (14d9, 20).

### C.     The Deal Protection Devices and Other Measures to Ensure the Tender Offer is Completed

77.     In addition to failing to obtain adequate consideration for Sequenom's stockholders, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to lock-up the Proposed Transaction and likely ensure that no competing offers for the Company will emerge.

78.     First, the Merger Agreement's no solicitation provision prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better offer for the Company's stockholders. Specifically, Section 5.3(b) of the Merger Agreement states that the Company and the Individual Defendants may not solicit, initiate, encourage or facilitate any alternative acquisition proposal. If the Company is contacted about a proposal, LabCorp must be notified and provided the details of the proposal. Merger Agreement, Section 5.3(c)-(d).

79.     Furthermore, Section 6.1 of the Merger Agreement grants LabCorp recurring and unlimited matching rights, which provides LabCorp with: (i)

unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) five business days to negotiate with Sequenom, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

80.     The no solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will likely be deterred from expending the time, cost, and effort of making a superior proposal while knowing that LabCorp can easily foreclose a competing bid.  As a result, these provisions unreasonably favor LabCorp, to the detriment of Sequenom's public stockholders.

81.     Additionally, Section 8.3 of the Merger Agreement provides that the Company must pay LabCorp a termination fee of $10.6 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal. The termination fee further deters other potential suitors from making a superior offer for the Company, as any competing bidder would have to pay a naked premium for the right to provide Sequenom's stockholders with a superior offer.

82.     Ultimately, these deal protection provisions restrain the Board's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

**D.     The 14d9 Provides Stockholders With Materially Incomplete and Misleading Information Concerning The Proposed Transaction**

83.     On August 9, 2016, Defendants caused the materially incomplete and misleading 14d9 to be filed with the SEC.  While the 14d9 provides a summary of the strategic review process the Board undertook prior to voting to enter into the Merger Agreement with LabCorp, and the financial analyses of JP Morgan performed in support of its fairness opinion, it omits certain critical information which render portions of the 14d9 materially incomplete and misleading.  As a

result of the incomplete and misleading 14d9, Sequenom's stockholders will be unable to make an informed decision concerning whether to tender their shares.

**Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction**

84. The 14d9 fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement.  In particular, the *Background of the Transaction* and *Reasons for Recommendation* (14d9, 20-23) sections is materially deficient in that it fails to disclose, but must be amended to disclose, the following information:

(a)     The circumstances that JP Morgan was familiar with the convertible debt issue such that it could make a presentation to the Board regarding this issue.  (14d9, 13).

(b)     The factors considered by the Board and JP Morgan to support the conclusion that financial buyers would not be interested in a strategic transaction with the Company and the time period when this decision was made.  (14d9, 13).

(c)     The terms of the preferred stock and refinancing of debt offer by Company C on October 18, 2015.  (14d9, 14).

(d)     The other entities and/or companies with which JP Morgan was in contact about a strategic transaction that were discussed with the Board at the October 27-28, 2015 Board meeting.  (14d9, 14).

(e)     The assumptions that were reflected in LabCorp's December 2, 2015 IOI, whether those assumptions were confirmed through due diligence and that rationale for LabCorp's deadline of December 28, 2015 for accepting the IOI.  (14d9, 14).

(f)     What "operating plan" was discussed by the Board at the

December 8-9, 2015 board meeting.  (14d9, 15).

(g)    When the Company's restructuring plan was first discussed and whether JP Morgan advised the Board on the restructuring plan.

(h)    The basis for amending this engagement with JP Morgan on February 15, 2016. (14d9, 16).

(i)    What the terms of the March 11, 2016 Company C counter-proposal were and the rational given by C for its withdrawal from the process in March 2016. (14d9, 16).

(j)    The details of the debt source and the terms of the financing received in May 2016.  (14d9, 17).

(k)    The rational for not even engaging with Company D about a strategic transaction.  (14d9, 17).

(l)    The Board's rationale on June 8, 2016 for not pursing further negotiations with Company A.  (14d9, 17).

(m)    The rational for choosing $3.00 as the minimum bid for the Company on June 8, 2016.  (14d9, 17).

(n)    What the "preliminary interest" was from LabCorp, Companies B and C to gain access to the Company's data room on June 10, 2010.  (14d9, 18).

(o)    The information discussed in June 2016 regarding the Company's oncology segment.  (14d9, 18).

(p)    The rational for the Company to make no effort to engage Company B in further discussions after it verbally communicated a $2.00 all cash offer for the Company's shares, especially when at the time of that offer, LabCorp's offer was a range of potential offer between $1.70 and $2.00.  (14d9, 18).

(q)    What the Board did to examine the future value and utilization of the Company's NOLs in respect to the proposals to acquire the Company in an all cash acquisition and an all-stock transaction, and disclose all projected benefits arising from the Company's NOLs.[11]   (14d9, 18).

(r)    The rational for Company C's failure to submit a proposal based on the Company's "proposed business plan." (14d9, 18).

(s)    The rationale for agreeing to sell the Company by means of a tender offer rather than a merger so that stockholders would have a chance to vote on a proposed sale of the Company.

(t)    Rationale for not including any financial data in projections associated with oncology ("liquid biopsy") that were reviewed by Board and JP Morgan when JP Morgan reviewed future opportunities in oncology on several occasions with the Board (including July 28, 2015, and September 18, 2015 when JP Morgan made a presentation to the Board regarding the value of spinning off the oncology operations).   (14d9, 13, 14). Indeed, numerous analysts and financial reporters project that the market for "liquid biopsy" could be in the billions of dollars.

---

[11]   As of December 31, 2015, federal and state tax net operating loss carryforwards totaled approximately $516.1 million and $401.9 million, respectively.   The federal tax loss carryforwards will begin to expire in 2019, unless previously utilized.   The state tax loss carryforwards continue to expire in 2016. At December 31, 2015, there was approximately $8.0 million of the Federal and California NOL carryforwards related to stock option exercise windfalls, which will result in an increase to additional paid-in capital, or APIC, and a decrease in income tax payable at the time such carry forwards are utilized https://www.sec.gov/Archives/edgar/data/1076481/000107648116000070/sqnm201510-k.htm (last visited 8/17/2016)

COMPLAINT

(u)     What steps were taken by the Board to engage strategic parties who had expressed an interest in the Company's liquid biopsy program after the Company announced on January 7, 2016 its initiative to divest and/or partner Sequenom's oncology liquid biopsy program.

85.     The omission of the above information renders statements in the Recommendation Statement, including "Reasons for the Recommendation of the Board" section false and/or materially misleading in contravention of the Exchange Act, and without this information, Sequenom stockholders cannot weigh and evaluate the Board's rationale for recommending they tender their shares.

**Materially Incomplete and Misleading Disclosures Concerning Sequenom's Financial Information and Banker Analysis**

86.     Further, the 14d9 fails adequately to disclose critical Company non-public projected financial data and/or assumptions (prepared in accordance with generally accepted accounting principles ("GAAP") and non-GAAP financial data) relating to the Company's future performance.  The 14d9 makes clear, that both the Board and JP Morgan (14d9, 27) relied continuously throughout the sales process on this information to reach a decision to enter into the Merger Agreement with LabCorp.   The omission of this information renders the 14d9 false and/or misleading as this information was relied on and utilized by the Board and JP Morgan.

87.     The section of the 14d9 entitled "Reasons for the Recommendation" (at 20-21) discloses the Board's bases for and/or information relied on to recommend that stockholders tender their Sequenom shares, including the following: (i) the potential value that might have resulted from other strategic options available to Sequenom, including **remaining a standalone public**

**company**, considering the lengthy process undertaken to obtain suitable financing or collaborations or other alternative transactions, the restructuring steps taken by Sequenom, **Sequenom's financial situation**, including substantial debt overhang, the competitive environment for molecular testing in women's healthcare and oncology, including Sequenom's need to expand its revenue for prenatal tests by addressing the average risk pregnancy population, the need to continue to reduce the per test costs and the reimbursement and pricing pressures facing Sequenom and other risks and uncertainties facing Sequenom as it refocuses its business model; (ii) risks in finding a strategic partner for Sequenom's **liquid biopsy program**; (iii) with respect to the risks associated with the proposed refinancing of the Company's convertible debt, that fact that "second and third installments totaling $60 million would have been subject to the achievement of designated **revenue milestones** by Sequenom".

88.   The Board's reasons for its recommendation as reflected above are false and/or misleading because, the information that forms the basis for the Board's recommendation, including the Company's non-public data and other internal information regarding its future performance, is not disclosed.   This undisclosed data includes GAAP financial projections, projections reviewed for the Company's liquid biopsy program, and the revenue milestones that were purportedly a part of the term sheet signed with a lender for term loan financing. Absent the data on the Company's future performance, stockholders cannot to weigh and gauge the Board's recommendation.   This material information must be disclosed to stockholders prior to the expiration of the tender offer.

89.   Moreover, the Company's financial projections that are disclosed are false and/or misleading in part due to the omission of critical financial data that was relied on by the Board and JP Morgan in negotiating and/or recommending the

Proposed Transaction including: (i) the Company's NOL carryforward and benefits derived therefrom that were provided to LabCorp;[12] (ii) projections for the Company's liquid biopsy program; and (iii) the estimates and assumptions made by the Company's management with respect to Sequenom's general business, economic, competitive, regulatory, reimbursement and other market and financial conditions and other future events (41d9, 23), and whether JP Morgan extrapolated the Company's projections from 2021 to 2025 utilizing these same estimates and assumptions.[13]

90.    The failure to disclose these inputs and/or assumption, to fully explain reconciliation of GAAP and non-GAAP financial projected data for purposes of reporting the financial data in the 14d9 violates SEC regulatory mandates and policy and renders the Company projected financial data and JP Morgan's valuation analysis that utilized such data, false and/or misleading, and renders the Board's recommendation false and/or misleading.  Further, the 14d9 discloses that the Individual Defendants acted on and issued its recommendation for Sequenom stockholders to tender their shares based on consultation with counsel, and therefore they were fully apprized of their legal and regulatory obligations to disclose and reconcile GAAP and non-GAAP projections and otherwise disclose Company forecasts in an accurate and non-misleading manner.  Due to the failure accurately and appropriately to disclose the Company's financial forecasts as

---

[12] The 14d9 projects the tax shield derived from the purported usage of NOLs which have a starting balance of over a half billion dollars  (14d9, 24).  However the 14d9 must disclose the same projected NOL figures that were disclosed to and utilized by LabCorp on June 28, 2016 to formulate its counter-offer, which it increased by approximately 40% after reviewing this information.  The 14d9 also must disclose the Board's basis for reflecting any projected benefit from the NOLs for this type of a transaction under the Internal Revenue Code.

[13] The estimates and assumptions as they relate to the extrapolated projections are particularly critical for stockholders as JP Morgan projected growth rates at a fraction of the growth rates utilized by management.  The forecasted lower growth rates naturally facilitated JP Morgan's fairness opinion with respect to the Merger Consideration.

described above, the following is rendered false and/or misleading (14d9 at 24-26).

91.   The failure to disclose the information in ¶¶87-90 above reflecting the Company's projected future performance metrics also specifically renders the 14d9 false and/or misleading with respect to JP Morgan's implied valuation reference range per share in its *Discounted Cash Flow Analysis* (p. 30).

92.   JP Morgan's *Discounted Cash Flow Analysis* further is rendered false and or misleading because the 14d9 fails to disclose of the inputs or assumption utilized to determine perpetuity growth rates ranging from 2.5% to 3.5% and discount rates ranging from 15% to 17.0%, including: (i) the identity, quantity, and source of the weighted average cost of capital ("WACC") assumptions utilized; (ii) the rational for utilizing the above discount rates; (ii) whether the perpetuity growth rates correspond to assumed terminal pricing multiples; and (iii) the adjustments for cash and debt that JP Morgan made to calculate the present value of unlevered free cash flows.  (14d9, 30).

93.   With respect to JP Morgan's *Public Trading Multiples* analysis (14d9, 28), the 14d9 fails to disclose the observed company-by-company multiples and financial metrics examined by JP Morgan, which renders the multiples disclosed and the range of equity values derived from these multiples false and/or misleading, especially in view of the fact that JP Morgan created three sets of equity value ranges utilizing the Sequenom projections (the Management case), equity research projections and, for undisclosed reasons, also created an equity value range that included the multiple range for Foundation Medicine, Inc.

94.   The failure to disclose the information above in paragraph 93 renders the Public Trading Multiples Analysis, false and/or misleading with respect to the estimated implied value per share of Sequenom common stock.

95.   With respect to JP Morgan's *Selected Transactions Analysis* (14d9,

29-30), the 14d9 fails to disclose (i) the observed transaction-by-transaction enterprise values and (ii) financial metrics; and (b) whether other multiples and/or transaction premiums were examined (if so, they should be disclosed).

96.    The failure to disclose the information above in paragraph 95 renders the Selected Precedent Transactions Analysis false and/or misleading with respect to the estimated implied value per share of Sequenom common stock.

97.    Defendants knowingly failed to disclose the material information discussed above.  In addition to violating the Federal Securities laws and SEC policies, rules and regulations regarding the use and/or emphasis of non-GAAP data, inputs assumptions and metrics without proper reconciliation with GAAP equivalents - which render such information misleading on its face - without materially complete disclosure of the information set forth above, stockholders cannot make an informed decision concerning whether or not to tender their shares. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

**E.    Defendants Knew or Recklessly Disregarded that the 14d9 Omits Material Information**

98.    The Individual Defendants, and thus Sequenom, knew or disregarded that the 14d9 contains the materially incomplete and misleading information discussed above.

99.    Specifically, Defendants on information and belief reviewed the contents of the 14d9 before it was filed with the SEC and certain Defendants attested that a due inquiry concerning the information set forth in the 14d9 was made, and the remaining Individual Defendants were obligated to review the 14d9 before it was filed with the SEC in accordance with their fiduciary duties.

Defendants were thus aware that the 14d9 contains the misleading partial disclosures referenced above.

100.   Accordingly, on information and belief, the Individual Defendants reviewed or were presented with the material information concerning the Projections and Pacific Crest's financial analyses which has been omitted from the Recommendation Statement, and thus knew or recklessly disregarded that such information has been omitted.

## CLASS ACTION ALLEGATIONS

101.   Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the other public shareholders of Sequenom who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

102.   This action is properly maintainable as a class action.

103.   The Class is so numerous that joinder of all members is impracticable. As of July 25, 2016, there were 119,243,357 million shares of Sequenom common stock outstanding, which on information and belief are held by hundreds to thousands of individuals and entities.   Members of the Class are dispersed throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

104.   Questions of law and fact exist that are common to the Class and predominate over any questions affecting only individual members, including, among others:

(a)    whether the Defendants have violated Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and

(b)    whether Plaintiff and the other members of the Class would be irreparably harmed if the Proposed Transaction complained of herein is consummated as currently contemplated.

105.   Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

106.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

107.   Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

108.   A class action is superior to other available methods for fairly and effectively adjudicating the controversy.

## COUNT 1

### Claim for Violations of Section 14(e) of the Exchange Act
### Against All Defendants

109.   Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

110.   Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…"  15 U.S.C. §78n(e).

111.   As discussed above, Sequenom filed and delivered the 14d9 to its shareholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

112.   During the relevant time period, Defendants disseminated the false and misleading 14d9 above.  Defendants knew or recklessly disregarded that the 14d9 failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

113.   The 14d9 was prepared, reviewed and/or disseminated by Defendants. It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Tender Offer, the intrinsic value of the Company, and potential conflicts of interest faced by certain Individual Defendants and the Company's financial advisor.

114.   In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the 14d9, Defendants were aware of this information and their obligation to disclose this information in the 14d9.

115. The omissions and incomplete and misleading statements in the 14d9 are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares or seek appraisal. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

116. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the 14d9, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14d9, rendering certain portions of the 14d9 materially incomplete and therefore misleading.

117. The misrepresentations and omissions in the 14d9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT II

### Claim for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9) Against All Defendants

118. Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

119. Defendants have caused the 14d9 to be issued with the intention of soliciting shareholder support of the Proposed Transaction.

120. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with

tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

121. SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

122. In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

123. The 14d9 violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the false and/or misleading.

124. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the 14d9, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14d9, rendering certain portions of the 14d9 materially incomplete and therefore misleading.

125. The misrepresentations and omissions in the 14d9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their

entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT III

### Claim for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

126.   Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

127.   The Individual Defendants acted as controlling persons of Sequenom within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Sequenom, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the 14d9 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

128.  Each of the Individual Defendants were provided with or had unlimited access to copies of the 14d9 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

129.  In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The 14d9 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.   They were, thus,

directly involved in the making of this document.

130.   In addition, as the 14d9 sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The 14d9 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

131.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

132.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants as follows:

A.   Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.   Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from closing the Tender Offer or otherwise consummating the Proposed Transaction, unless and until the Company discloses the material information identified above which has been omitted from the 14d9;

C.     Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.     Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  August 17, 2016

**FARUQI & FARUQI, LLP**

s/ Barbara A. Rohr                          
Attorney for Plaintiff
Email: brohr@faruqilaw.com


Barbara A. Rohr SBN 273353
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile:  (424) 256-2885
Email:  brohr@faruqilaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com

jwilson@faruqilaw.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 601-2610
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*

COMPLAINT

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, _Shikha Gupta_ ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a draft complaint against Sequenom, Inc.  ("Sequenom") and the other named defendants and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.      Plaintiff selects Monteverde & Associates PC and Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.      Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.      Plaintiff's transactions in Sequenom securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.      In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, unless otherwise specified below.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this _17_ day of August, 2016.

_Shikha Arorg._

| Transaction<br>(Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 07/26/13 | 100.00 |
| Purchase | 08/07/13 | 200.00 |
| Purchase | 11/26/13 | 100.00 |
| Purchase | 02/11/14 | 100.00 |
| Purchase | 09/12/15 | 250.00 |
| Purchase | 07/06/16 | 500.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |